IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LLOYD V. HICKS, | ) | CASE NO. 3:16CV1509 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| JASON BUNTING, | ) | JONATHAN D. GREENBERG |
| Warden | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the undersigned pursuant to Local Rule 72.2.  Before the Court is the Petition of Lloyd V. Hicks ("Hicks" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  Hicks is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Hicks,* Seneca County Court of Common Pleas Case No. 13 CR 0166.  For the following reasons, the undersigned recommends the Petition be DISMISSED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The

state appellate court summarized the facts underlying Hick's conviction as follows:

> {¶ 2} The facts relevant to this appeal are as follows. On October 9, 2013, Hicks was indicted for two counts of Felonious Assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), both felonies of the first degree and both containing specifications that Hicks discharged a firearm at a peace officer while committing the offenses, one count of Abduction in violation of R.C. 2905.02(A)(2),(C), a felony of the third degree, and one count of Aggravated Arson in violation of R.C. 2909.02(A)(1),(B)(2), a felony of the first degree.  The charges stemmed from incidents all occurring on September 5, 2013.

> {¶ 3} On November 8, 2013, Hicks was arraigned and entered pleas of Not Guilty and Not Guilty by Reason of Insanity to the charges against him.  (Doc. 13). As a result, the trial court ordered a competency evaluation of Hicks, which was done, and then the trial court held a hearing as to Hicks's competency.  Hicks was ultimately determined to be competent to stand trial.  (Doc. 21).

> {¶ 4} Hicks then requested a second competency evaluation, which was granted by the trial court, and Hicks was again found to be competent following a hearing. (Doc. 29).  After both competency evaluations, Hicks withdrew his plea of Not Guilty by Reason of Insanity and pled Not Guilty to the charges against him.

> {¶ 5} The case then proceeded to a jury trial, which was held June 9–10, 2014. At trial the State first called Donna Hicks, Hicks's wife of 23 years. Donna testified that in the weeks and months prior to September 5, 2013, she and Hicks had been having marital issues. (Tr. at 148).  Donna testified that a tornado had damaged their residence and that their basement had been flooded so they were having the house repaired, which was a frequent source of argument between them.  (*Id*.)  Donna testified that Hicks accused Donna of being in a relationship with the contractor, and accused her of being "in cahoots" with him when the repairs were delayed.  (*Id*.)  Donna testified that Hicks was irritated with the delay in the home repairs and that he had become verbally abusive toward her.  (Tr. at 148).

> {¶ 6} Donna testified that on the morning of September 5, 2013, she was leaving for work and noticed that Hicks had placed two gas cans in her car. (Tr. at 149). Donna testified that she and Hicks owned two acres of land and used a lot of gas for their tractor so Hicks would regularly put the empty gas cans in her car and she would fill them and bring them back for him. (Tr. at 149).  Donna testified that she filled up the two gas cans Hicks had placed in her car and returned them on her lunch break from work.  (Tr. at 150).  Donna testified that she placed the two gas cans in the shed that day and saw that there were four total. (Tr. at 150-

2

151).  She testified that she then went into the kitchen to eat her lunch.  (Tr. at 151).

{¶ 7} Donna testified that as she ate her lunch, Hicks came in from outside and started a conversation about the roof and how the contractor was "ripping [them] off." (Tr. at 152).  Donna testified that Hicks became upset, threw his hat, and knocked her pop onto her sandwich.  (Tr. at 152).  Donna testified she then decided to go back to work.  (*Id.*)  Donna testified that Hicks told her she had an hour for lunch and she was not going anywhere because they needed to talk about the repair issues.  (*Id.*)  Donna testified that she then went outside to smoke and Hicks followed.  (Tr. at 153).  Donna testified that she tried to leave, which resulted in her and Hicks engaging in a "slap and punch fest," where her glasses were ultimately knocked off and she walked away.  (*Id.*)

{¶ 8} Donna testified that Hicks made the comment that "nobody is here to help you" and that she was afraid of him at the time.  (Tr. at 153).  Donna also testified that Hicks took her phone and threw it in the front yard and told her she only uses the phone to "call [her] boyfriends" and that she was not going to use the phone to call for help.  (Tr. at 154).  Donna testified that Hicks then went into the garage and got a sledgehammer and smacked it into the ground.  (Tr. at 155).  She testified that she thought Hicks was smashing her phone.  (Tr. at 155).  Donna testified that Hicks then made a comment that they could pull the cars into the garage, and he could shoot her, set the house on fire, and then kill himself.  (Tr. at 155–156).  Donna testified that Hicks said he did not believe in God and that "[t]oday was the day and this was the end of it."  (Tr. at 155).

{¶ 9} Donna testified that she then again tried to leave, but Hicks grabbed her and tried to pull her toward the house.  (Tr. at 156).  Donna testified that Hicks had a hold of both her arms and smacked her.  (*Id.*)  She testified that she kicked him and Hicks said that she kicked "like a little bitch," so he then kicked her back and pulled her four feet toward the garage.  (*Id.*)  Donna testified that she then kicked Hicks twice in the groin and got away from him to her car.  (*Id.*)  Donna testified that another brief struggle ensued at her car, but she soon got away and drove back to work.  (Tr. at 157).

{¶ 10} Donna testified that when she got back to work she told her coworkers what had happened and that she was afraid of Hicks, so her co-worker contacted security and the police were then called.  (Tr. at 157–158).  Donna testified that she was then taken to the police station, where she heard over the radio about a fire occurring at her home.  (Tr. at 159).

{¶ 11} Donna testified that as a result of the altercation with Hicks the side of her face was black and blue, there was a twitch in her eye, and her vision was blurry.  (Tr. at 160).

3

{¶ 12} The State next called Sharon Fuchs, who was a neighbor of Hicks and Donna. Fuchs testified that on September 5, 2013, she went to lunch with her daughter around 12:30 or 1:00 p.m. and saw billowing smoke coming out of the Hicks' home. (Tr. at 180). Fuchs testified that Donna's car was gone and that Hicks was under the pavilion pacing. (Tr. at 180). Fuchs testified that she said to Hicks the house was on fire and Hicks said "I know get the F away." (Tr. at 181).

{¶ 13} The State next called Detective E. Burt of the Bellevue Police Department. Detective Burt testified that he was dispatched to the Hicks residence, which was engulfed in flames. (Tr. at 188). Detective Burt testified that upon arrival he was informed by the firemen who were already on the scene that they could not do their job because of a man in the backyard with a firearm. (Tr. at 188). Detective Burt testified that he then observed Hicks in a chair with a handgun in his lap in the backyard. (Tr. at 189).

{¶ 14} Detective Burt testified that Officer Trego arrived on the scene minutes later, and that together they attempted to approach Hicks. (Tr. at 190). Detective Burt testified that while they approached Hicks, he heard someone yell "get away" and then he heard a shot fired, which went to his left. (Tr. at 194). Detective Burt testified that he heard the bullet go through the grass roughly ten to fifteen feet from him. (Tr. at 194). Detective Burt testified that Officer Trego yelled "he shot at us" and that they then retreated to call for backup due to Hicks shooting, and the presence of a propane tank nearby that was potentially in danger of exploding from the fire. (Tr. at 194–195).

{¶ 15} The State next called Officer Todd Trego of the Bellevue Police Department. Officer Trego testified that he was originally dispatched to the Home Savings Bank where Donna worked to speak with her and take her to the Bellevue Police Department. (Tr. at 211). Officer Trego testified that he was subsequently dispatched to the Hicks' home, where he was advised by Detective Burt that a man with a gun was in the backyard. (Tr. at 212).

{¶ 16} Officer Trego testified that he and Detective Burt attempted to make contact with Hicks, so they walked between the house that was on fire and the next door neighbor's house toward a shed using it as cover. (Tr. at 212). Officer Trego testified that Detective Burt was on his right and that he noticed a propane tank approximately 10–15 feet from the house and was worried about an explosion. (Tr. at 212). Officer Trego testified that upon noticing the propane tank, he and Detective Burt discussed whether to get closer. (Tr. at 213). Officer Trego testified that as they were discussing whether to get closer, Hicks shouted to "get back" or "get away." (Tr. at 213). Officer Trego testified that he then saw Hicks fire a gun right in their direction, saw the muzzle flash, and heard a possible round strike the grass nearby. (Tr. at 213). Officer Trego testified that he and Detective Burt then decided to retreat. (*Id.*)

4

{¶ 17} The State next called Deputy Mark Lawson of the Seneca County Sheriff's Office.  Deputy Lawson testified that he was dispatched to the Hicks' residence for the house fire and that upon his arrival fire trucks were present but could not begin to help because of Hicks having a gun.  Deputy Lawson testified that he exited his cruiser in a different area of the property than where Detective Burt and Officer Trego had approached Hicks.  Deputy Lawson testified that as he exited his cruiser, Hicks pointed his gun at him and fired it, so Deputy Lawson got back in his cruiser and backed up to a safer location and called in the shot.  (Tr. at 229–230).  Deputy Lawson testified that it was "absolutely not" a warning shot. (Tr. at 239).  Deputy Lawson testified that he heard a second shot as he exited the cruiser but he did not see it, and that the shots were ten to fifteen seconds apart. (Tr. at 237).  Deputy Lawson testified that he then got his M–16 out of his vehicle but he did not fire it because Hicks did not point his gun at him again.  (Tr. at 230).

{¶ 18} Deputy Lawson testified that after an hour of negotiation, Hicks put his weapon down and was taken to jail.  Deputy Lawson testified that he was the officer who took Hicks to jail, and that he noticed Hicks had burnt hair on his forearm, abrasions on his right hand ring finger, and burnt hair on the back of his head.  (Tr. at 232).

{¶ 19} On cross-examination Deputy Lawson testified that while he was on the Hicks' property he heard loud noises coming from inside the house fire that he thought were rounds of ammunition popping off.  (Tr. at 235).  However, Deputy Lawson testified that it was not possible that the shots that were fired at him were simply rounds popping off in the basement of the home.  (Tr. at 236).

{¶ 20} The State next called Sheriff W. Eckelberry, the Seneca County Sheriff. Sheriff Eckelberry testified that he was dispatched for the house fire and a subject with a weapon.  (Tr. at 244).  He testified that when he arrived, Hicks was in the backyard, east of the residence sitting in a lawn chair.  (Tr. at 245).  Sheriff Eckelberry testified that he shut down the road near the property, and then talked to Hicks over the PA system.  (Tr. at 247).  Sheriff Eckelberry testified that he corresponded with Hicks and eventually got Hicks to put his gun down and walk back to a police car with him.  (Tr. at 247).

{¶ 21} The State next called Deputy Craig Robbins from the Seneca County Sheriff's Office. Deputy Robbins testified that he located a spent casing near where Hicks had been in the yard.  (Tr. at 254).  Deputy Robbins testified that the casing matched the rounds in the gun Hicks had been using.  (Tr. at 273).

{¶ 22} The State next called Kevin Reinbolt, a Detective with the Seneca County Sheriff's Office.  Detective Reinbolt testified that he recovered a second shell

5

casing from the scene that matched Hicks's firearm.  (Tr. at 289).  Detective Reinbolt also testified that heat from the fire could be felt 20–30 feet away, and that the combustion of the fire blew the front door out.  (Tr. at 295).

{¶ 23} In addition, Detective Reinbolt testified that he interviewed Hicks at the Sheriff's office.  The video of that interview was played for the jury, which included Hicks stating that Donna was the main aggressor in their altercation, and that Hicks had Parkinson's disease.  (State's Ex. 12).  Hicks stated in the interview that shots had probably been fired in the area where shell casings were found because he had been shooting at coyotes.  (*Id*.)  The video showed Hicks saying that he remembered watching the house burn on the date of the incidents thinking "What'd I do?"  (*Id*.)  During the interview Hicks also said that Donna would not know anything about the fire because she left.  (*Id*.)

{¶ 24} The last witness called by the State was Donald Illig an Arson Investigator with the Fire Marshall's Office. Donald Illig testified that he determined that the fire to the home had been intentionally set.  (Tr. at 334).  He also testified that the fire was a risk to the people looking to help, to the firefighters and the police officers on scene due to the amount of smoke, the ammunition in the basement that was popping off, and the propane tank outside the home, which posed a "significant threat" to cause an explosion that could send shrapnel hundreds of feet.  (Tr. at 335–337).

{¶ 25} At the conclusion of Illig's testimony the State rested its case and Hicks made a Crim.R. 29 motion for acquittal, which was denied by the trial court. Hicks then specifically stated that he did not want an instruction on lesser included offenses.  Subsequently the parties proceeded to closing arguments and the court gave final instructions to the jury.  The case was then submitted to the jury for deliberation.

{¶ 26} Ultimately the jury found Hicks guilty of both counts of Felonious Assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), both felonies of the first degree, and the jury found Hicks guilty of the specifications on each of the two counts that Hicks discharged a firearm at a peace officer while committing the offenses. Hicks was also found guilty of Abduction in violation of R .C. 2905.02(A)(2),(C), a felony of the third degree, and he was found guilty of Aggravated Arson in violation of R.C. 2909.02(A)(1), (B)(2), a felony of the first degree.  The trial court set sentencing for the following day.

{¶ 27} On June 12, 2014, Hicks's sentencing hearing was held. At the sentencing hearing, the State recommended that Hicks serve an aggregate 20 year prison sentence.  Hicks's attorney made a statement in mitigation, and then Hicks spoke on his own behalf.  After hearing the statements of the parties, the court sentenced Hicks to serve 10 years in prison on Count 1 Felonious Assault, and 7 years for

the firearm specification, to be served consecutively.  Hicks was ordered to serve
10 years on Count 2, Felonious Assault, and 7 years on the firearm specification.
Hicks was ordered to serve 12 months on Count 3, Abduction, and 10 years on
Count 4 Aggravated Arson.  All counts were ordered to be served concurrent to
each other, with the sole exception of the Felonious Assault in Count 1 and the
firearm specification in Count 1, for an aggregate prison term of 17 years.  A
judgment entry reflecting this sentence was filed that same day, June 12, 2014.
(Doc. 58).

*State v. Hicks,* 2014 WL 7278466 at *1-5 (Ohio App. 3rd Dist. Dec. 22, 2014).

## II. Procedural History

### A.    Trial Court Proceedings

On October 9, 2013, a Seneca County Grand Jury charged with Hicks with (1) two counts

of felonious assault in violation of Ohio Rev. Code ("O.R.C.") § 2903.11(A)(2), (D)(1)(a), each

with the specifications that Hicks discharged a firearm at a peace officer while committing the

offenses and the firearm was subject to forfeiture as an instrumentality used in commission of the

felonies, pursuant to O.R.C. § 2981.02(A)(3)(a) (Counts One and Two); (2) one count of

abduction in violation of O.R.C. §2905.02(A)(2), (C) (Count Three); and (3) one count of

aggravated arson in violation of O.R.C. §2909.02(A)(1), (B)(2) (Count Four).  (Doc. No. 6-1,

Exh. 1.)  Hicks pled not guilty and not guilty by reason of insanity to all charges.  (Doc. No. 6-1,

Exh. 2.)

The trial court then ordered a competency evaluation, pursuant to O.R.C. § 2945.371.

(Doc. No. 6-1, Exh. 3.)  This evaluation was conducted by Thomas G. Sherman, M.D., who

determined Hicks was competent to stand trial.  (*Id.*)[1]  Hicks then withdrew his plea of not guilty

---

[1]     Both the Respondent and the state appellate court decision indicate a second
competency evaluation was conducted at some point prior to trial.  However, this
evaluation is not part of the state court record before this Court.  (Doc. No. 6 at 8;
Doc. No. 6-1, Exh. 9.)

7

by reason of insanity.  (*Id.*)  On March 10, 2014, Hicks pled not guilty to all charges.  (Doc. No. 6-1, Exh. 4.)

The case proceeded to jury trial commencing June 9, 2014.  (Doc. No. 6-2., Exh. 15 at Tr. 3.)  Pursuant to Ohio. Crim. R. 29, Hicks moved for an acquittal at the close of the State's case, which the trial court denied.  (Doc. No. 6-2, Exh. 16 at Tr. 371.)  Hicks renewed his Ohio Crim. R. 29 Motion for Acquittal after the defense rested and the state trial court again denied the motion.  (*Id.*)  The jury found Hicks guilty of two counts of felonious assault with peace officer and firearm specifications (Counts One and Two), abduction (Count Three), and aggravated arson (Count Four).  (*Id.* at Tr. 450-452.)

The trial court conducted a sentencing hearing on June 11, 2014, at which time Hicks was sentenced to two 10-year sentences for each felonious assault conviction, plus two 7-year sentences for the firearm specifications; 12 months in prison for the abduction conviction; and 10 years in prison for the aggravated arson conviction.  (Doc. No. 6-1, Exh. 5.)  The trial court ordered the sentences for all convictions be served concurrently, with the exception of the felonious assault in Count One and the firearm specification in Count One, for an aggregate sentence of 17 years, seven of which were mandatory.  (*Id.*)  The trial court further ordered Hicks pay restitution in the amount of $92,415.07 to the victim, Donna Hicks.  (*Id.*)

**B.     Direct Appeal**

On July 10, 2014, Hicks, through counsel, filed a Notice of Appeal with the Court of Appeals for the Third Appellate District ("state appellate court").  (Doc. No. 6-1, Exh. 6.)  In his appellate brief, Hicks raised the following assignment of error:

> I.      The conviction in the trial court should be reversed because the
>         evidence and the decision was against the manifest weight of the

evidence and because the evidence supporting it was insufficient as a
matter of law to prove the convictions beyond a reasonable doubt.

(Doc. No. 6-1, Exh. 7.)  The State filed a brief in response.  (Doc. No. 6-1, Exh. 8.)

On December 22, 2014, the state appellate court affirmed Hicks's convictions and prison

sentences.  (Doc. No. 6-1, Exh. 9.)  *See also State v. Hicks,* 2014 WL 7278466 (Ohio App. 3rd

Dist. Dec. 22, 2014).

On April 6, 2015, Hicks, *pro se,* filed a Notice of Appeal with the Supreme Court of

Ohio.  (Doc. No. 6-1, Exh. 10.)  As this Notice was untimely, Hicks also filed a Motion for

Leave to File a Delayed Appeal.  (Doc. No. 6-1, Exh. 11.)  The Supreme Court of Ohio granted

the motion.  (Doc. No. 6-1, Exh. 12.)  Thereafter, on June 29, 2015, Hicks filed a  Memorandum

in Support of Jurisdiction, and raised the following Proposition  of Law:

> I.    When a conviction is against the manifest weight of the evidence
>       because the evidence is itself insufficient to support a conviction the
>       resulting convictions are a violation of the 5th and 14th amendments of
>       the US Constitution and the equivalent sections and articles o[f] the
>       Ohio constitution.  This is what occurs when all essential elements of
>       the charges against the defendant are lacking.

(Doc. No. 6-1, Exh. 13.)  The State did not file a response.

On September 30, 2015, the Supreme Court of Ohio declined to accept jurisdiction of the

appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 6-1, Exh. 14.)

**C.**     **Federal Habeas Petition**

On June 15, 2016,[2] Hicks filed a Petition for Writ of Habeas Corpus in this Court and

---

[2]  Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner
delivers it to prison authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  While the
Petition herein did not arrive at the Court for filing until June 17, 2016, Hicks states that
he placed it in the prison mailing system on June 15, 2016.  (Doc. No. 1 at 15.)  Thus,
the Court will consider the Petition as filed on June 15, 2016.

asserted the following grounds for relief:

> **GROUND ONE**: Insufficient evidence/lack of manifest weight to support convictions in violation of the 5th and 14th amendments.
>
> **Supporting facts:** Under no possible stretch of the imagination was all the essential elements of any of the charges against this petitioner proved beyond a [illegible] reasonable doubt and actually [illegible] in violation of [illegible] requirements of the due process process [sic].

(Doc.  No. 1. at 5.)

On September 30, 2016, Warden Bunting ("Respondent") filed his Return of Writ.  (Doc. No. 6.)  Hicks filed a Motion for the Extension of Time to File Traverse on October 17, 2016. (Doc. No. 7.)  The Court granted the Motion, affording Hicks an additional 45 days to file a Traverse.  (Doc. No. 8.)  Thereafter, on December 12, 2016, Hicks filed a Traverse.  (Doc. No. 9.)

### III.  Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

10

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court. *See Parker v. Matthews*, 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. Sept. 22, 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 2012 WL 2076341, *6; *Howes v. Walker*, 132 S.Ct. 2741, 2012 WL 508160 (2012). *See also Lopez v. Smith*, ⸺ U.S. ⸺, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, ⸺ U.S. ⸺, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. *See also Shimel*, 838 F.3d at 695. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court

11

decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.  Rather, a

federal district court must determine whether the state court's decision constituted an objectively

unreasonable application of federal law.  *Williams,* 529 U.S. at 410-12.  "This standard generally

requires that federal courts defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. App'x

511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the

Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the

state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks

omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness

question as a test of its confidence in the result it would reach under *de novo* review," and that

"even a strong case for relief does not mean the state court's contrary conclusion was

unreasonable."  *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas

corpus is a guard against extreme malfunctions in the state criminal justice systems" and does

not function as a "substitute for ordinary error correction through appeal."  *Id*. (internal quotation

marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking

in justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement."  *Id*. at 786–87.  This is a very high standard, which

the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet,

that is because it is meant to be.")

### IV. Analysis of the Petition

### 1.      Manifest Weight and Sufficiency of the Evidence

In his sole ground for relief, Hicks asserts his convictions were against the manifest

12

weight of the evidence and/or not supported by substantial evidence.  (Doc. No. 1 at 5.)  Hicks

argues his convictions are not supported by the evidence in light of the following: (1) "no round

was found in the chamber when the weapon was secured meaning it had not been fired;" (2) the

testimony from the police officers "is totally uncorroborated and highly skeptical at best;" (3) the

testimony from the fire marshal proved someone set the fire, but there is "no evidence

whatsoever proving that this petitioner set the fire;" and (4) there is no evidence to support

Donna Hicks' testimony regarding the abduction conviction.  (Doc. No. 9 at 5, 10, 17, 20.)

Respondent maintains "there is more than ample evidence to support the convictions."

(Doc. No. 6 at 19.)  Further, with regards to Hicks' manifest weight of the evidence claim,

Respondent argues this claim is not cognizable for federal habeas corpus review.  (*Id*.)

As to Hicks' manifest weight of the evidence claim, this claim is rejected on the grounds

that such claims are not cognizable on federal habeas review.[3]  *See, e.g., Nash v. Eberlin*, 437

F.3d 519, 524 (6th Cir.2006); *accord Howard v. Tibbals*, 2014 WL 201481 at * 16 (N.D. Ohio

Jan. 17, 2014); *Hess v. Eberlin*, 2006 WL 2090093 at *6 (S.D. Ohio Jan. 17, 2006).

To the extent Hicks raises a sufficiency of the evidence claim, the Court finds it to be

---

[3]     As explained by the U.S. District for the Southern District of Ohio, "under Ohio law,
a claim that a verdict was against the manifest weight of the evidence-as opposed to
one based upon insufficient evidence-requires the appellate court to act as a
'thirteenth juror' and review the entire record, weigh the evidence, and consider the
credibility of witnesses to determine whether 'the jury clearly lost its way and
created such a manifest miscarriage of justice that the conviction must be reversed
and a new trial ordered.'" *Hess v. Eberlin,* 2006 WL 2090093 at *7 (S.D. Ohio Jan
17, 2006), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (Ohio
Ct. App. 1983).  Because a federal district court does "not function as an additional
state appellate court, vested with the authority to conduct such an exhaustive
review," this Court cannot consider whether Hicks' conviction was against the
manifest weight of the evidence.  *Id.*

without merit.  The state appellate court considered Hicks' sufficiency claim on direct appeal

and rejected it as follows:

> {¶ 34} On appeal, Hicks argues that there was insufficient evidence to
> support his Felonious Assault convictions and the accompanying
> specifications, and that the convictions were against the weight of the
> evidence.  Specifically, Hicks contends that none of the officers
> witnessed Hicks shooting at the other officers, that none of the officers
> saw a "muzzle flash" from the gun, that none of the officers saw any
> recoil on the gun when it was fired, and that no cartridge was found in the
> chamber when the firearm was "made safe" by Deputy Robbins.  Despite
> Hicks's contention, ample testimony was presented by the officers at trial
> from which the trier-of-fact could determine that Hicks had fired his gun
> at the police officers in both separate incidents.

> {¶ 35} The first Felonious Assault conviction was related to the bullet
> that Hicks fired at Detective Burt and Officer Trego. Regarding that
> incident, Detective Burt testified that when Officer Trego arrived on
> scene, he and Officer Trego attempted to approach Hicks in the backyard
> of his home.  Detective Burt testified that while approaching Hicks, he
> heard Hicks yell "get away" and then he heard a shot fired, which
> Detective Burt testified went roughly ten to fifteen feet to his left.

> {¶ 36} Officer Trego testified that he actually saw Hicks point the gun
> right in their direction and fire.  He testified, "[Hicks] basically shouted
> either get back or get away, raised his hand, I saw a gun in his hand, fired
> off the shot, saw the muzzle flash, and then heard what I thought was
> possibly a round striking to our left-hand side in the grass."  (Tr. at 213).
> Officer Trego testified specifically that he saw Hicks point the gun "right
> [in] our direction and fire [ ] a round[.]"  (*Id.*)  Thus Officer Trego
> explicitly testified that Hicks aimed the gun at him and Detective Burt,
> and that he observed Hicks fire the weapon.  Corroborating the officers'
> testimony, spent shell casings were recovered in the area where Hicks
> was positioned with his weapon in the backyard while the residence was
> burning.  Officer Trego's testimony also directly undermines Hicks's
> claim that none of the officers witnessed a muzzle flash from the weapon.

> {¶ 37} When viewing the evidence presented in the light most favorable
> to the prosecution, we cannot find that insufficient evidence was
> presented to convict Hicks on this count of Felonious Assault or the
> accompanying specification.

> ***

{¶ 42} On appeal, Hicks argues that there was insufficient evidence to support the conviction for Abduction, and that his conviction was against the weight of the evidence.  Specifically, Hicks contends that there were no witnesses to corroborate Donna's story, and that the evidence did not indicate that Donna was in fear of Hicks.

{¶ 43} Despite Hicks's arguments, Donna testified that Hicks prevented her from leaving her house on the date of the incident not once, but twice. The second time Donna testified that Hicks physically pulled Donna several feet toward the garage, restraining her from leaving. Donna also testified that Hicks physically struck her, that he also kicked her, and that she was in fear of him.  Donna testified that she had to physically kick Hicks in the groin twice to ultimately get away from him.  As a result of the incident, Donna testified that she had bruises and blurry vision.

{¶ 44} Thus not only did Donna testify that she was in fear of Hicks, she also testified that she was physically harmed by him, which goes even further than what is necessary under the Abduction statute.  All that is required under the statute to prove Abduction is that the victim be subjected to a risk of physical harm or be in fear.  Here, not only was there a risk of physical harm in this instance, but there was actual physical harm.

{¶ 45} When viewing the evidence in the light most favorable to the prosecution, we cannot find that that there was insufficient evidence presented to convict Hicks of Abduction of Donna.

***

{¶ 48} On appeal, Hicks argues that there was insufficient evidence to support his conviction for Aggravated Arson and that his conviction was against the weight of the evidence.  Hicks's sole argument against his conviction seems to be that the arson investigator, and also the jury, did not take into account the possibility that Donna could have set the fire.

{¶ 49} Hicks attempts to establish motive for Donna as a potential suspect for starting the fire, pointing out that Donna had picked up some of the gasoline that day, that Donna later filed for divorce from Hicks and that Donna eventually contacted the insurance company to try and get reimbursed for some of the losses from the fire.  However, Donna testified that picking up gasoline for Hicks was routine, that she was not fully reimbursed for all of the losses from the fire, and that she had contemplated divorce even before the September 5, 2013 incidents.

15

{¶ 50} Moreover, Hicks's argument ignores his own statements made in an interview with the police where Hicks stated that Donna would not know anything about the fire because she left.  (State's Ex. 12).  Hicks also made the statement in his interview with the police that he remembered thinking "What'd I do?" as he watched the house burn.

{¶ 51} In addition, Donna testified to threats that Hicks had made on the day of the incident regarding burning down the house.  Donna testified that Hicks threatened to burn the house down and threatened to burn it to the ground before he let anyone else have it.  Furthermore, when Hicks finally submitted to authorities, he had various burns on his body indicating proximity to the fire.  Thus on the basis of the evidence presented we cannot find that there was insufficient evidence to convict Hicks, or that his conviction was against the weight of the evidence.  His argument on this issue is, therefore, not well taken.

*State v. Hicks,* 2014 WL 7278466 at *7-9.

Additionally, in rejecting Hicks' manifest weight of the evidence challenge, the state appellate court explained as follows:

{¶ 38} In arguing that his conviction was against the weight of the evidence, Hicks makes a number of claims essentially contending that the police did not conduct enough investigation to see if Hicks had fired his weapon such as swabbing his palms or checking the firearm for a round in the chamber.  However, there was no testimony indicating that there was not a round in the chamber of the weapon when it was recovered and there was direct evidence provided by Officer Trego that Hicks fired the gun directly at the officers.  On the basis of the evidence presented, we cannot find that Hicks's conviction for Felonious Assault and the accompanying specification against Detective Burt/Officer Trego was against the weight of the evidence.  Therefore, Hicks's argument on this issue is not well-taken.

{¶ 39} Hicks's second Felonious Assault conviction was related to the bullet he fired at Deputy Mark Lawson.  Deputy Lawson testified that as he arrived on the Hicks' property and got out of his vehicle, Hicks "pointed his gun at [him] and fired." (Tr. at 229–230).  Deputy Lawson testified that he actually saw Hicks point his gun at him, and that it was "absolutely not" a warning shot. (Tr. at 239).  When viewing Deputy Lawson's testimony in the light most favorable to the prosecution, we cannot find that there was insufficient evidence to convict Hicks of Felonious Assault and the accompanying specification.

16

{¶ 40} Hicks attempts to argue that his conviction was against the weight of the evidence by contending again that the State did not prove Hicks had actually fired the gun, arguing rather that the sound of gunfire could have been rounds of ammunition that were in the house fire popping off from the basement.  In addition, Hicks argues that Deputy Lawson did not testify to seeing a muzzle flash when the gun was fired.  However, Deputy Lawson specifically testified that Hicks fired the gun at him and that it was not possible that the gunshots he heard were from rounds popping in the basement.  (Tr. at 236).  On the basis of Deputy Lawson's testimony we cannot find that the factfinder clearly lost its way on this issue.  Therefore Hicks's arguments as to his Felonious Assault convictions and the accompanying specifications are not well-taken.

***

{¶ 46} In arguing that his conviction for Abduction was against the weight of the evidence, Hicks challenges Donna's credibility stating that her actions were not consistent with a woman in fear.  However, as previously noted, placing the victim in fear is only one possible path to Abduction, and physical harm was present here.  Nevertheless, Donna specifically testified that she was in fear of Hicks and the jury was free to judge her credibility and her actions.  Therefore, we cannot find that his conviction was against the weight of the evidence.  Accordingly, Hicks's argument on this issue is not well-taken.

*Id*.

A petitioner who claims the evidence at trial was insufficient for a conviction must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  *See also Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000).  The role of the reviewing court in considering such a claim is limited:

A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court.  It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony.  An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims.  The mere existence of sufficient evidence to convict therefore

17

defeats a petitioner's claim.

*Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (internal citations omitted).

Moreover, it is well established that "'attacks on witness credibility are simply challenges to the

quality of the government's evidence and not to the sufficiency of the evidence.'" *Martin v.*

*Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935

(6th Cir.1984)).

  Consistent with these principles, the Supreme Court has emphasized that habeas courts

must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas
> proceedings because they are subject to two layers of judicial deference.  First, on
> direct appeal, 'it is the responsibility of the jury—not the court—to decide what
> conclusions should be drawn from evidence admitted at trial.  A reviewing court
> may set aside the jury's verdict on the ground of insufficient evidence only if no
> rational trier of fact could have agreed with the jury.'  *Cavazos v. Smith*, 565 U.S.
> 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam).  And second, on
> habeas review, 'a federal court may not overturn a state court decision rejecting a
> sufficiency of the evidence challenge simply because the federal court disagrees
> with the state court. The federal court instead may do so only if the state court
> decision was 'objectively unreasonable.' " *Ibid*. (quoting *Renico v. Lett*,
> 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012).  Under this

standard, "we cannot rely simply upon our own personal conceptions of what evidentiary

showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e ... inquire

whether any rational trier of fact would conclude that petitioner ... is guilty of the offenses with

which he is charged."  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  Rather, a habeas

court must confine its review to determining whether the state court "was unreasonable in its

conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt

based on the evidence introduced at trial."  *Id*. (emphasis in original) (citing *Knowles*, 129 S.Ct.

18

at 1420.

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Hicks' convictions for felonious assault, abduction, and aggravated arson were supported by sufficient evidence.  In resolving this claim, the state appellate court accurately summarized the evidence of record and correctly identified the applicable law.[4]

As noted in the state appellate court decision, the victim, Donna Hicks, testified at length regarding the events leading up to the abduction and the house fire.  (Doc. No. 6-2, Tr. 148-179.)  Ms. Hicks testified she and her husband, Lloyd Hicks, had been having martial problems prior to the events on September 5, 2013.  (*Id.* at Tr. 150.)  She stated when she left for work on September 5, 2013, she noticed Hicks put two gas cans in her car.  (*Id.* at Tr.151-152.)  She testified this was not unusual, as he normally did this to remind her to fill up the gas cans for their lawn mower.  (*Id.*)  Ms. Hicks filled up the gas cans, and returned home for lunch.  (*Id.* at Tr. 152.)  Upon her return, she placed the two filled gas cans in the shed on the property, and noticed there were four gas cans in the shed.  (*Id.* at Tr. 152-153.)

Thereafter, Ms. Hicks testified she went inside the house, and ate lunch.  (*Id.* at Tr. 153.)  She stated Hicks entered the kitchen, and began to argue with her about a home construction issue.  (*Id.*)  Hicks became agitated, threw off his hat, and knocked Ms. Hicks' drink into her

---

[4]    Although the state appellate court did not expressly cite the United States Supreme Court's decision in *Jackson v. Virginia, supra,* it employed an identical standard of review in considering this claim.  Hicks does not argue that, under these circumstances, the state appellate court's failure to specifically cite *Jackson* constitutes error or alters the standard of review in these habeas proceedings.  Moreover, even if this Court were to review this claim *de novo*, it would find, for the reasons set forth *infra*, that Hicks' convictions are supported by sufficient evidence in the record.

19

lunch. (*Id*. at Tr. 154.) She got up, and told Hicks she was returning to work. (*Id*.) She went outside and placed her purse in her car. Then, she and Hicks began to have a "slap and punch fest." (*Id*. at Tr. 155.) Ms. Hicks testified she walked away from this altercation, and sat on the front stoop of the home to smoke a cigarette. (*Id*.) She stated Hicks told her "Nobody is here to help you," and took her cell phone and threw it in the front yard. (*Id*. at Tr. 155-156.) Ms. Hicks stated she got up and retrieved her cell phone, and Hicks then commented, "You're not calling for help, you don't need that phone, all you use it for is to call your boyfriends." (*Id*. at Tr. 156.) Ms. Hicks testified she gave the phone back to him, and he again threw into the front yard. (*Id*.)

Ms. Hicks testified Hicks proceeded to walk into the garage, and returned with a sledgehammer. (*Id*. at Tr. 157.) She stated Hicks began to hit the ground with the sledgehammer, and she assumed he was destroying her phone. (*Id*.) Ms. Hicks testified Hicks suggested they "pull both cars into the garage and go into the house, there was a pistol on the counter in the kitchen, and he was going to shoot me, set the house on fire, and then shoot himself." (*Id*. at Tr. 157-158.) Thereafter, Ms. Hicks attempted to leave a second time, and Hicks "grabbed [her] and tried to pull [her] into the house." (*Id.* at Tr. 158.) Ms. Hicks kicked him twice in the groin, got into her car, and drove back to work. (*Id*. at Tr. 158-159.) She stated she was afraid to go into the home with him, "because he would have shot and killed [her]." (*Id*. at Tr. 159.)

Ms. Hicks testified that, upon her return to work, she alerted a co-worker what had occurred. (*Id*. at Tr. 160.) This co-worker contacted the security department at her place of employment, who in turn called the Bellevue Police Department. (*Id.*) She stated she had bruising on the right side of her face, her arms, and her right knee, as well as twitching in her eye

20

and blurred vision from the incident with Hicks.  (*Id.* at Tr. 162.)  Ms Hicks further testified

when she returned to the scene with the fire marshal, she observed one gas can in the shed, when

there had previously been four.  (*Id.* at Tr. 163.)

The State next presented the testimony of Sharon Fuchs, the Hicks' neighbor.  (*Id.* at Tr.

180.)  Ms. Fuchs testified she had gone out to lunch with her daughter and grandson, and upon

her return, she noticed smoke billowing out of the Hicks' garage.  (*Id.* at Tr. 181-182.)  She

noted Donna Hicks' car was not in the driveway.  (*Id.* at Tr. 182.)  Ms. Fuchs ran around the

home, and saw Lloyd Hicks in his backyard, pacing under a pavilion.  (*Id.*)  She testified she told

Hicks his house was on fire, and Hicks responded, "I know, get the F away."  (*Id.* at Tr. 183.)

The State also called multiple police officers to testify regarding Hicks' behavior on

September 5, 2013.  (*Id.* at Tr.188-328.)  Detective Eric Burt with the City of Bellevue Police

Department was the first to testify.  (*Id.* at Tr. 188.)  Detective Burt testified he was dispatched to

the Hicks' residence on September 5, 2013.  (*Id.* at Tr. 189, 190.)  Upon his arrival, the Hicks'

residence was fully engulfed in flames.  However, the fire department was unable to attend to the

fire because Hicks was sitting in the backyard with a firearm.  (*Id.* at Tr. 191.)  Detective Burt

testified he and another officer, Officer Trego, approached Hicks.  (*Id.* at Tr. 192.)  As they

approached him, Detective Burt heard someone yell "Get away," and then heard a shot fired.

(*Id.* at Tr. 195-196.)  Detective Burt testified he heard a bullet go through the grass 10-15 feet to

his left.  (*Id.* at Tr. 196.)  He denied seeing Hicks point a gun at him, or any "muzzle flash" or

recoil from the gun.  (*Id.* at Tr. 201-202.)  He did not know if any spent shell casings were found

in the gun or near Hicks' location.  (*Id.* at Tr. 206.)

Officer Todd Trego with the City of Bellevue Police Department testified he was initially

dispatched to Donna Hicks' place of employment, the Home Savings and Loan Bank. (*Id*. at Tr. 210.) He met with Donna Hicks, and felt she was in "shock." (*Id*. at Tr. 212.) He then left the bank, and went to the Hicks' residence to assist Detective Burt. (*Id*. at Tr. 213.) Officer Trego testified as he and Detective Burt approached Hicks, he noticed a large propane tank 10-15 feet from the house, and was concerned it would explode. (*Id*. at Tr. 214-215.) As he and Detective Burt were discussing if they should get closer, Officer Trego heard Hicks shout, and saw him raise his gun and fire off a shot. (*Id*. at Tr. 215.) He saw a "muzzle flash" and heard "possibly a round striking to our left-hand side in the grass." (*Id*.) Officer Trego testified Hicks raised the firearm "right at our direction and fired a round." (*Id*.)

The State then called Deputy Mark Lawson from the Seneca County Sheriff's Office. (*Id*. at Tr. 228.) Deputy Lawson testified he was dispatched to the Hicks' residence for "a house fire and a possible domestic situation." (*Id*. at Tr. 229.) He stated when he approached the residence, "the firemen were unable to put the fire out due to a man in the backyard with a gun." (*Id*. at Tr. 230.) Deputy Lawson testified that, as he exited his vehicle, Hicks pointed his gun at him and fired. (*Id*. at Tr. 231-232.) He did not see a "muzzle flash" or recoil, and he was adamant this was not a "warning shot." (*Id*. at. Tr. 238, 241.) Deputy Lawson got back into his vehicle. (*Id.* at Tr. 232.) As he exited his vehicle a second time, he heard, but did not see, a second shot. (*Id*.) Deputy Lawson retrieved his M16 firearm from his vehicle, and pointed the firearm at Hicks. (*Id*.) Hicks did not point his gun back at him. (*Id*.)

Deputy Lawson testified Hicks was eventually brought into custody. (*Id*. at Tr. 234.) He stated when he was transporting Hicks to the Seneca County Jail, he noticed "burnt hair on the right forearm of Mr. Hicks, some type of an abrasion on his right hand, ring finger, and what

22

appeared to be burnt hair on the back of his head.  (*Id*.)

The State then called Sheriff William Eckelberry, the Seneca County Sheriff.  (*Id*. at Tr. 245.)  He testified he ordered for the road to be closed, due to the fear Hicks might discharge his firearm again.  (*Id*. at Tr. 249.)  He directed one of his sergeants to talk to Hicks over a PA system, instructing Hicks to set his firearm down and walk away.  (*Id*.)  Hicks eventually complied, and Sheriff Eckelberry walked with him to the police vehicles.  (*Id*. at Tr. 250.)

Deputy Craig Robbins with the Seneca County Sheriff's Office testified he observed the 45 minute negotiation between Hicks and the Sheriff.  (*Id*. at Tr. 255.)  After Hicks was taken into custody, he "located the firearm, secured the firearm, unloaded it, and made it safe."  (*Id*.)  He also found a shell casing on the ground next to where Hicks had been sitting.  (*Id*. at Tr. 256.)  This casing matched the ammunition used in the firearm recovered at the scene.  (*Id*. at Tr. 271-272.)  Deputy Robbins testified no bullets were recovered at the scene.  (*Id.* at Tr. 272.)  Thereafter, Deputy Robbins, a certified firearms instructor, function tested the firearm and ammunition.  (*Id.* at Tr. 257.)  He testified both were functional.  (*Id*. at Tr. 258, 271.)

Detective Kevin Reinbolt with the Seneca County Sheriff's office testified he processed the crime scene by taking pictures, measurements, and witness statements.  (*Id*. at Tr. 290.)  He recovered two shell casings, along with a firearm.  (*Id*.)  The firearm had two expelled casings from its magazine.  (*Id*. at Tr. 328.)  Detective Reinbolt stated no testing had been done on the casings to determine how long they had been in the yard.  (*Id.* at Tr. 323.)

Detective Reinbolt also interviewed Hicks at the Sheriff's office on September 25, 2013.  (*Id*. at Tr. 300.)  A video of the interview was played for the jury, which included Hicks asserting Donna Hicks was the aggressor in the altercation.  (*Id*. at Tr. 304.)  Hicks stated after Donna left

23

the home, "I got highly strung out. I got mad. Very angry. But what happened after that, I don't know." (*Id*. at Tr. 311.) He denied shooting at any police officers, and suggested the recovered shell casings were from him firing at coyotes in his yard. (*Id*. at Tr. 311-312.) Hicks stated as he watched his home burn, he thought "What'd I do? What happened?" (*Id*. at Tr. 313.) During the interview, Hicks also asserted Donna Hicks was "not going to know anything about the fire because she left." (*Id*. at Tr. 317.)

The final witness called by the State was Donald Illig, an Assistant State Fire Marshal. (*Id*. at Tr. 331.) Mr. Illig conducted an investigation of the burned structure, and concluded the fire was intentionally set. (*Id*. at Tr. 337.) Mr. Illig testified this fire posed a "significant threat" to others, due to the risk of the propane tank exploding. (*Id*. at Tr. 340.) He also stated preventing the fire department from attending to this fire increased this risk. (*Id*. at Tr. 341.) Mr. Illig testified he could not determine who set the fire from his investigation. (*Id.* at Tr. 348.)

### *a. Felonious Assault*

The Court finds the state appellate court reasonably concluded sufficient evidence supported the jury's findings as to each element of felonious assault.[5] There was ample evidence Hicks discharged a firearm directly at two police officers. Officer Todd Trego testified he saw Hicks fire his gun in his direction. (Doc. No. 6-2, Tr. 215.) He saw the "muzzle flash" from the discharge of the bullet, and heard it land in the grass to his left side. (*Id*.) Similarly, Deputy

---

[5]     At the time of Hicks' conviction, O.R.C. §2903.11(A)(2) & (D)(1)(a) provided: "No person shall knowingly . . .[c]ause or attempt to cause physical harm to another . . .by means of a deadly weapon or dangerous ordnance. . . If the victim . . . is a peace officer . . . felonious assault is a felony in the first degree." (Doc. No. 6-1, Exh. 9 at 99.)

Mark Lawson testified Hicks pointed and fired his gun at him.  (*Id.* at Tr. 231-232.)  While he did not see a "muzzle flash" or recoil, he saw Hicks point the gun at him and shoot.  Deputy Lawson was also adamant it was not a "warning shot."  (*Id*. at Tr. 238, 241.)  Moreover, Deputy Craig Robbins located two shell casings at the crime scene, which matched Hicks' firearm.  (*Id*. at Tr. 271.)  He tested the ammunition and the firearm, and found both to be functioning properly.  (*Id*. at Tr. 258, 271.)

Hicks argues "since no bullet was found in the chamber, [the gun] had not been fired at all."  He asserts "this fact is proven scientifically and is therefore indisputable."  (Doc. No. 9 at 10.)  The Court disagrees.  A careful review of the trial record does not reveal any evidence or testimony indicating there was no bullet in the chamber.  Deputy Craig Robbins stated he "located the firearm, secured the firearm, unloaded it, and made it safe."  (Doc. No. 6-2, Tr. 255.)  He stated the pistol contained a magazine with live rounds of bullets, and both the bullets and the gun worked.  (*Id*. at Tr. 256, 271.)  At no point did Deputy Robbins testify there was "no bullet in the chamber," despite Hicks' assertion otherwise.  (Doc. No. 9 at 13.)

Hicks also raises arguments regarding the lack of testing for gunshot residue or the age of the shell casings.  (Doc. No. 9 at 4, 11.)  Hicks points to no legal authority or precedent indicating the State was required to perform this testing.

Hicks also asserts the testimony from the police officers was "totally uncorroborated and high skeptical."  (Doc. No. 9 at 10.)  He makes much of the fact Officer Trego testified he was 50-60 feet from Hicks, when he was actually 167 feet away.  (*Id*. at 11.)  Hicks offers other explanations for the gunshots heard by the officers, suggesting these shots were from bullets exploding in his home during the fire.  (*Id*. at 10.)  He also notes none of the officers saw "any

25

recoil which when considering the age and condition of this petitioner would have clearly occurred if the weapon was actually fired." (*Id*. at 15.)

As an initial matter, contrary to Hicks' argument, Officer Trego did testify he saw recoil from the gun when Hicks shot at him. (Doc. No. 6-2, Tr. 225.) As for his other arguments, Hicks is arguing the state appellate court should have reconsidered the credibility of the police officers' testimony. The credibility of witnesses' testimony, however, was outside the scope of the state appellate court's consideration of Hicks' claim of insufficient evidence. *See Martin*, 280 F.3d at 618. Rather, the state appellate court properly considered all of the evidence in the light most favorable to the State and determined there was sufficient evidence to convict him.

### b. Abduction

The Court finds the state appellate court reasonably concluded sufficient evidence supported the jury's findings as to each element of abduction.[6] Donna Hicks' testimony provides evidence Petitioner abducted her. Donna Hicks testified her husband acted aggressively towards her in their home, and prevented her from leaving their property on two occasions. (Doc. No. 6-2, Tr. 153, 154, 155, 158.) In addition, Ms. Hicks testified that, the second time she attempted to leave, Hicks physically restrained her and pulled her several feet. (*Id*. at Tr. 158.) Ms. Hicks testified Hicks made several threatening comments towards her, suggested a murder-suicide, and started banging a sledgehammer on the ground. (*Id*. at Tr. 155, 156, 157, 158.) Moreover, Officer Trego testified Ms. Hicks was in "shock," and Deputy Craig Robbins testified Ms. Hicks

---

[6]     At the time of Hicks' conviction, O.R.C. §2905.02(A)(2) provided: "No person, without privilege to do so, shall knowingly . . . [b]y force or threat, restrain the liberty of another person under circumstances that creates a risk of physical harm to the victim or place the other person in fear[.]" (Doc. No. 6-1, Exh. 9, Tr. 102.)

26

had bruising on her face, corroborating her testimony.  (*Id*. at Tr. 212, 260.)

Hicks argues "other than [Donna Hicks'] testimony . . . no credible evidence exists" to support a conviction of abduction.  He argues she was not exhibiting behavior typical "for someone being abducted or in fear."  (Doc. No. 9 at 20.)  While the primary evidence for the abduction charge was Ms. Hicks' testimony, it was within the jury's purview to determine her credibility.  As noted *supra,* determining the credibility of witness testimony is beyond the scope of review for a state appellate court in sufficiency of evidence claims.  *Martin*, 280 F.3d at 618. The state appellate court properly considered all of the evidence in the light most favorable to the State and determined there was sufficient evidence to convict him.

### *c. Aggravated Arson*

Finally, the Court finds the state appellate court reasonably concluded sufficient evidence supported the jury's findings as to each element of aggravated arson.[7]  There is abundant evidence Hicks knowingly set fire to his residence, and created a risk of a propane tank explosion.  Testimony from multiple witnesses indicates the Hicks' residence was "engulfed in flames," and ultimately, was completely destroyed.  (Doc. No. 6-2, Tr. 190, 214, 230, 248, 334.) Fire Marshal Illig determined the fire was set intentionally and moreover, that the propane tank near the home posed a significant risk for explosion.  (*Id*. at 337, 340.)  He further testified Hicks' decision to keep the fire department at bay increased this risk.  (*Id*. at 341.)

While Fire Marshal Illig could not determine who set the fire, Donna Hicks testified

---

[7]     At the time of Hicks' conviction, O.R.C. §2909.02(A)(1) provided: "No person, by means of fire or explosion, shall knowingly . . . [c]reate a substantial risk of serious physical harm to any person other than the offender[.]" (Doc. No. 6-1, Exh. 9, Tr. 104.)

Hicks had threatened to burn the house down with her in it.  (*Id*. at 157, 158, 348.)  Ms. Hicks

also testified when she returned to the scene of the crime, three of the four gas tanks in the shed

were missing.  (*Id*. at 163.)  Moreover, Hicks, in an interview with Detective Reinbolt, stated

while he watched his home burn he thought "What'd I do? What happened?"  (*Id*. at 313.)  Hicks

also asserted in the interview Donna Hicks was "not going to know anything about the fire

because she left."  (*Id*. at 317.)  Finally, Deputy Lawson testified when he was transporting

Hicks to the Seneca County Jail, he noticed Hicks had burnt hair on his right forearm and the

back of his head.  (*Id*. at 234.)

Hicks argues there is evidence indicating it was Donna Hicks who set the fire.  (Doc. No.

9 at 17.)  He asserts it was Donna who purchased the gas, attempted to make an insurance claim,

and left the house just prior to the fire.  (*Id*.)  However, the jury heard this evidence and

concluded it was Hicks who set the fire.  The jury was permitted to draw this inference, in light

of the Donna Hicks' testimony and the interview with Detective Reinbolt.  *See Coleman,* 132

S.Ct. at 2064 ("*Jackson* leaves to juries broad discretion in deciding what inferences to draw

from the evidence presented at trial, requiring only that juror 'draw reasonable inferences from

basic facts to ultimate facts'").

Hicks also maintains he did not create a "substantial risk of physical harm," as required

by the aggravated arson provision in the O.R.C.  (Doc. No. 9. at 18.)  He attempts to argue he

was actually *preventing* any risk or harm to others, by attempting to keep them off his property.

(*Id*.)  The Court rejects this argument.  The evidence introduced at trial provides substantial

support for the jury's conclusion Hicks was creating a risk of harm for others.  Specifically, that

he prevented the fire department from attending to the fire, he was aware of the large propane

28

tank near the house, and he took no steps towards stopping the fire or seeking help.  The

possibility of a propane tank explosion was very real, which, according to the fire marshal,

created a "significant threat" to others.  (Doc. No. 6-2, Tr. 340.)

       In sum, the Court finds the state appellate court reasonably applied clearly established

federal law when it considered Hicks' argument there was insufficient evidence to support his

convictions, and there is no basis for this Court to conclude that the state court decision in this

case was contrary to, or involved an unreasonable application of, clearly established federal law.

Accordingly, it is recommended Hicks' Ground For Relief be denied.

       **2.**       **Hicks' Attempts to Raise Additional Habeas Claims in Traverse**

       Finally, the Court rejects Hicks' attempt to raise additional habeas claims in his Traverse.

Specifically, Hicks advances the following arguments in his Traverse: (1) the firearm

specification violates "double jeopardy and due process;" and (2) "there was no separation of the

witnesses in this case which gave the state an unfair advantage," which constitutes "another

violation of due process."  (Doc. No. 9 at 9, 21.)

       Neither of the above claims are raised in the Petition.  Nor has Hicks properly moved to

amend his Petition to raise them.  Morever, Hicks did not raise either argument at the state

appellate level or to the Supreme Court of Ohio.  (*See* Doc. No. 6-1, Exhs. 7 & 13.)  Because

these claims are asserted for the first time in his Traverse, they are not properly before this Court

and will not be addressed herein.  *See, e.g., Tyler v. Mitchell,* 416 F.3d 500, 504 (holding that

because the petitioner's claim was presented in his traverse rather than in his petition, the district

court did not err in declining to address it); *Palmer v. Bagley,* 2005 WL 3965400 at \*8 (S.D.

Ohio Dec. 16, 2005) ("a traverse, however, it not the proper vehicle in which to raise new claims

or sub-claims in habeas corpus."); *Burns v. Birkett,* 2007 WL 2318740 at *5, n. 2 ("Because these claims are being presented for the first time in petitioner's traverse or reply brief, rather than in his habeas petition, this Court declines to address these claims, because they are not properly before this Court.").

### V. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DISMISSED.


Date:  February 7, 2018                                    *s/ Jonathan Greenberg*
                                                                       Jonathan D. Greenberg
                                                                       United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**